IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BETTY JEAN NITZ,                               Case No. 13-cv-1135-pp

                          Plaintiff,

v.

CAROLYN W. COLVIN,

                          Defendant.

**ORDER VACATING THE FINAL ADMINISTRATIVE DECISION OF THE
COMMISSIONER, AND REMANDING FOR FURTHER PROCEEDINGS**

## I.    INTRODUCTION

Plaintiff Betty Jean Nitz applied for social security benefits, claiming that she could no longer work due to chronic back and leg pain. The Social Security Administration (SSA) denied her application, as did an Administrative Law Judge (ALJ). The plaintiff requested review by the Appeals Council, but the Council denied review. The plaintiff now seeks judicial review pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3), arguing that the ALJ erred in evaluating the Residual Functional Capacity (RFC), in assessing the plaintiff's credibility, and in posing the hypothetical question to the Vocational Expert (VE). For the reasons stated below, the court vacates the Commissioner's denial of the plaintiff's application for benefits, and remands the case for further proceedings consistent with this opinion.

1

## II. STANDARD OF REVIEW

### A. Judicial Review

When the Appeals Council denies a claimant's request review, the ALJ's decision constitutes the final decision of the Commissioner. Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Judicial review under 42 U.S.C. §405(g) is limited; the court will reverse only if the ALJ's decision is not supported by substantial evidence, is based on legal error, or is so poorly articulated as to prevent meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Id. (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). If conflicting evidence in the record would allow reasonable minds to disagree about whether the claimant is disabled, the ALJ's decision to deny the application for benefits must be affirmed. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The court must review the entire record, including both the evidence that supports as well as evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009). The ALJ's decision to deny benefits must be untainted by an erroneous credibility finding. Engstrand v. Colvin, 788 F.3d

2

655, 660 (7th Cir. 2015). "An ALJ is in the best position to determine the credibility of witnesses," and the court will uphold his credibility determination unless it was patently wrong. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). If the ALJ gives "specific reasons supported by the record" to explain a credibility determination, the court will not overturn that credibility determination unless it is "patently wrong." Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013). "Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006). "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014).

In sum, the court will uphold a decision so long as the record reasonably supports it and the ALJ explains his or her analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

B. Disability Determination

The Social Security Administration provides "disability insurance benefits and supplemental security income to persons who have a 'disability.'" Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003) (citing 42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B)). To qualify as "disabled," the claimant must demonstrate a "physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age,

3

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. The Social Security Act further "defines 'disability' as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. at 23.

In evaluating a claim for disability benefits, the ALJ follows a five-step, sequential process, asking:

> (1) Has the claimant engaged in substantial gainful activity since his alleged onset of disability?
>
> (2) If not, does he suffer from a severe, medically determinable impairment?
>
> (3) If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?
>
> (4) If not, does he retain the residual functional capacity ("RFC") to perform his past work?
>
> (5) If not, can he perform other jobs existing in significant numbers?

E.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

If it appears at any step that the claimant is or is not disabled, the analysis ends. 20 C.F.R. §404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

4

## III.    DISCUSSION

### A.    Medical Evidence and Work History

#### 1.    *Physical Health History*

The plaintiff suffered a herniated disc from a car accident that occurred on June 19, 2003. Dkt. No. 28-8 at 2. An MRI, conducted on February 5, 2004, demonstrated "a broad-based left lateral disc protrusion" on the plaintiff's L4-5 vertebrae. Id. at 16. The radiologist also discovered "degenerative signal abnormalities in the" L5-S1 vertebrae. Id. This left the plaintiff with "persistent back pain." Id. at 37. At first, the plaintiff "underwent a series of conservative treatment," which included "chiropractic manipulation . . . , physical therapy, [and] prescription medications." Id. When those treatments failed, she had back surgery in March of 2004. Id. at 2. The procedure "consisted of left L4-L5 partial hemilaminectomy, mesiofacetectomy, foraminotomy removal of disc herniation and decompression of the thecal sac and exiting nerve roots." Id. at 13.

Although she "report[ed] to be in good general health" at her August 9, 2005 vocational health evaluation, id. at 2, her complaints of "low back pain," id. at 13, "left hip and thigh discomfort," id., and "buttock numbness," id., were attributed to the back injury. The plaintiff asserted at the August 9, 2005 evaluation that she had experienced constant pain and discomfort since the accident and that the pain had "erod[ed] her work tolerance and physical capacity." Id. at 3. In July 2005, an examination of the plaintiff revealed "postoperative scarring on the left L4-L5." Id. at 14. The doctor determined that

5

a "steroid injection" might serve "both diagnostic and therapeutic purposes." Id.
As a result, the plaintiff received steroid injections on August 11 and 31, 2005.
Id. at 9, 11.

Post-surgery, the plaintiff continued to have annual exams and as-
needed visits with Affinity Medical Group. Dkt. No. 28-8 at 22-111. At her
"routine postop followup [sic]," the plaintiff reported that her pre-surgery pain
had "greatly improved." Id. at 59. At a general physical in December of 2004,
the plaintiff felt well and had "no specific new concerns to present." Id. at 56.
At a follow-up appointment to a lumbar MRI on July 27, 2005, the physician
reported that the plaintiff presented "evidence of continued lower back pain
likely secondary to scar tissue formation surrounding the left L5 nerve root."
Id. at 53. At the December 2005 general physical, the physician noted that
although the plaintiff did not have "any specific new problems since her last
exam . . . she [had] continued to have some pain in the low back area with the
radiation into the left leg." Id. at 49. The doctor also mentioned the steroid
injections that the plaintiff received in August of that year. Id.

On August 25, 2006, the plaintiff visited Affinity Medical Group with
complaints of "left buttock pain, back pain, [and] hip pain." Id. at 37. The
plaintiff "describe[d] her symptoms as constant, deep, burning pain localized in
the buttocks, the hips, thigh, leg, and foot, mostly on the left side." Id. The pain
grew "worse with sitting, standing, walking, laying, twisting, and bending
forward," and "changing of position" did not provide any relief. Id. The doctor
"advised her to treat the pain on a conservative basis," which included a

6

recommendation of physical therapy and aerobic exercise. Id. at 39. The doctor noted that the plaintiff "might benefit from the chronic pain program." Id.

The plaintiff returned to Affinity Medical Group in December of 2006 for her annual physical. Id. at 34-36. At that time, "she still suffer[ed] from some chronic pains in her extremities," but she generally felt "well" and had "no acute symptoms or problems to present." Id. at 34. The doctor made a similar finding at the 2007 general exam. Id. at 31-33. At the plaintiff's 2008 annual exam, the physician noted, "She feels well today and has no acute symptoms or problems to present today." Id. at 28. The doctor listed the plaintiff's ongoing medical problems, and included "chronic low back pain" and "history of post laminectomy pain syndrome." Id. The physician diagnosed the plaintiff as "normal" and "stable." Id. at 29.

The medical staff made almost identical evaluations at the plaintiff's 2009 and 2010 annual physicals. Id. at 25-26. See also Dkt. No. 28-9 at 129-30. On December 8, 2011, the plaintiff's physician's assistant at Affinity diagnosed the plaintiff with "chronic low back/buttocks pain," but released her for sedentary work, noting that she was capable of frequent "sitting" and occasional to frequent "standing/walking," with no climbing, bending, kneeling, squatting or crawling. Dkt. No. 28-10 at 24. The physician's assistant indicated that the plaintiff needed to be exempted "from bending/lifting duties," because it "aggravate[d] her condition." Id.

Case 2:13-cv-01135-PP   Filed 09/30/15   Page 7 of 28   Document 32

When applying for social security benefits in 2010, the plaintiff underwent a "physical residual functional capacity assessment." Id. at 2-9. The examining doctor found that the plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds. Id. at 3. She could "stand and/or walk" for about six hours and could sit "with normal breaks" for six hours. Id. According to the evaluation, the plaintiff could "push and/or pull" for an unlimited amount of time. Id. She had no postural, manipulative, visual, communicative, or environmental limitations. Id. at 4-6. The doctor commented, "She had full range of motion in all extremities and showed no physical limitations. . . . Objective evidence shows no significant issues with mobility." Id. at 9.

> 2. *Mental Health History*

Along with her annual physical exams, the plaintiff regularly sought psychiatric treatment. Dkt. No. 28-8 at 112-22. Just before the car accident, on March 25, 2003, the plaintiff had a consultation at Green Lake County Department of Health & Human Services. Id. at 117. She had visited the clinic because her longtime treating psychiatrist planned to retire and she needed "someone to continue [her] treatment." Id. The intake form indicated that the plaintiff had "been diagnosed to have Generalized Anxiety Disorder and Depression, many years ago," and had seen the same doctor since 1986. Id. The anxiety and depression stemmed from about ten years of serious abuse during the plaintiff's childhood, but she had responded well to medication. Id. Once the doctor found the right balance of medication, the plaintiff had "been

8

able to hold a full time job for many years and . . . [had] not encountered any significant or adverse effects or side effects." Id. The intake physician maintained the same level of treatment and encouraged the plaintiff to follow up as needed. Id. at 118.

The record does not contain any history of return visits to the psychiatrist until March 21, 2006. Dkt. No. 28-10 at 46. During that visit, the doctor's notes indicated that he had increased one of the doses of the plaintiff's medications, and that she had responded well to that. Id. In July of 2006, the plaintiff still did not display any severe symptoms of depression or anxiety. Id. at 45. She continued to have similar visits and evaluations from November 9, 2006 through November 20, 2007. Id. at 45-40. A period of unemployment (between September 2005 and August 2006) caused her symptoms to heighten in 2007, but the medications and supportive therapy helped her cope. Id. at 40. Her February 26, 2008 progress report indicated that when the plaintiff had learned her job at a company called Advocap would be renewed, the plaintiff's symptoms improved and she reported being "much more relaxed." Id. at 39. She continued her follow-ups in 2008 and early 2009. Id. at 38-35.

On April 21, 2009, the doctor found that the plaintiff "like[d] her job for now and reported that she has not had [any] major episode[s] of anxiety. She also did not report any acute symptoms of depression." Dkt. No. 28-8 at 116. The doctor maintained the treatment and asked the plaintiff to follow up in three months. Id. The psychiatrist made a similar finding on July 28, 2009. Id. at 115. At her visit on November 10, 2009, the plaintiff "continue[d] to do well

9

and she has been employed and doing well at her job." <u>Id.</u> at 114. She indicated that she had "not been having any panic attacks or severe depression." <u>Id.</u> The doctor made "no new recommendation" and asked for a follow-up in three months. <u>Id.</u> On February 23, 2010, the plaintiff told her psychiatrist that she did not have "any concerns regarding her treatment" and had "no severe episodes of anxiety or depression." <u>Id.</u> at 113. At an appointment on August 3, 2010, the psychiatrist noted, "[S]he continues to suffer from constant pain in her lower back. She said that she is considering applying for disability." <u>Id.</u> at 112.

Although her medications continued to manage her anxiety and depression, at an appointment on November 2, 2010, the plaintiff told her doctor that she continued to suffer "from pain on her back radiating to her lower extremities," which got "too uncomfortable at times," and caused issues when she had to stand at work. Dkt. No. 28-10 at 29. She made a similar complaint on February 22, 2011, stating that she had to lift boxes at work which aggravated her back problems. <u>Id.</u> at 28. On May 24, 2011, she arrived at her psychiatric follow-up with two pillows and told the doctor she had "been feeling miserable." <u>Id.</u> at 27. A similar visit took place on September 6, 2011. <u>Id.</u> at 26. At that appointment, the psychiatrist indicated that "no change in her cognitive function" had occurred, and he highlighted her "good memory and concentration." <u>Id.</u> On January 24, 2012, the plaintiff informed her doctor that the back pain had begun to affect her depression. <u>Id.</u> at 25.

10

In December 2010, as part of the process for applying for Social Security benefits, the SSA evaluated the plaintiff's functional abilities, including how her anxiety and depression might affect her daily life. Dkt. No. 28-7 at 43-58. The evaluating doctor found that the plaintiff's "mental impairments" had a "mild affect" on the plaintiff's daily living, social functioning, and concentration. Id. at 57. The doctor thought this might cause the plaintiff to miss work "about two days per month." Id. at 58. At a similar evaluation in April 2011, the reviewing doctor stated, "Claimant's mental condition is not severe and does not preclude competitive employment." Dkt. No. 28-10 at 22.

       3.    *Work History*

The plaintiff has an extensive work history, and continued to work after the accident occurred. Dkt. No. 28-7 at 18-32. From 1981 to 1997, she served as a secretary at Ripon College. Id. at 18. From 1999 to 2001, she worked as a secretary and accounts receivable clerk for Austin Powder Company. Id. From July 2005 through September of that year, she worked as an accounting clerk at Heidel House and Resort. Id. Finally, from August of 2006 to June of 2012, she worked as a clerical assistant at Advocap, Inc. Id. See also Dkt. No. 28-3 at 15.

While working for Advocap, the plaintiff did "filing, coordinate[d] county billing . . . , [and] help[ed] in other areas of [the] accounting department." Dkt. No. 28-7 at 22. She also created "reports" in Word and Excel, worked at the reception desk, and answered phones. Id. On her work-history report, the

plaintiff indicated that she worked four hours a day, five days a week, and for $7.25 an hour. Id. Of the four hours, she walked for one hour, stood for one hour, and sat for most of the shift. Id. She noted that Advocap was "aware of" her "restrictions," such that she did not have to "lift or carry anything heavy." Id.

   B.   Procedural History

   The plaintiff first applied for disability benefits on July 8, 2010. Dkt. No. 28-6 at 5. She filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income. Id. at 2-9. In the applications, the plaintiff indicated a disability onset date of June 19, 2003. Id. at 5. On September 22, 2010, the SSA determined that the plaintiff did not qualify for benefits "because [she was] not disabled or blind under [the] rules." Dkt. No. 28-5 at 2. The plaintiff completed a request for reconsideration on October 21, 2010. Id. at 6. On April 20, 2011, the SSA found "that the previous determination denying [her] claim was proper under the law." Id. at 8. On May 27, 2011, the plaintiff filed a request for a hearing by an ALJ. Id. at 16.

   The ALJ held a hearing by video on November 20, 2012. Id. at 58. See also Dkt. No. 28-3 at 34-75. At the hearing, the plaintiff amended her disability onset date to January 1, 2009. Dkt. No. 28-3 at 13. The ALJ rendered a decision on January 9, 2013. Id. at 10-25. The ALJ found that "the claimant is not disabled" under the Social Security Act. Id. at 20.

   On March 6, 2013, the plaintiff sought a review of the hearing decision. Id. at 9. The SSA Appeals Council denied the request and "found no reason

12

under [the] rules to review the Administrative Law Judge's decision." Id. at 2. The Appeals Council indicated that if the plaintiff "disagree[d] with [the council's] action," she could "ask for court review" of the ALJ's decision "by filing a civil action." Id. at 3.

On October 4, 2013, the plaintiff filed a social security complaint in this court. Dkt. No. 1. She filed a supporting brief on May 23, 2014. Dkt. No. 21. The defendant filed the administrative transcript and an accompanying brief on August 21, 2014. Dkt. Nos. 28-29. The plaintiff filed a reply brief on September 15, 2014. Dkt. No. 30.

## IV. DISCUSSION

The plaintiff raised two issues on appeal: (1) whether substantial evidence supported the ALJ's finding regarding the plaintiff's Residual Functional Capacity (RFC); and (2) whether the ALJ properly assessed the plaintiff's credibility. The court finds in favor of the Commissioner on the first issue, but vacates and remands for further proceedings regarding the ALJ's credibility determination.

### A. There was substantial evidence to support the RFC finding.

#### 1. *The evidence regarding the RFC finding as to physical impairment*

The ALJ followed the five-step process for determining disability. Dkt. No. 28-3 at 15-20. With regard to whether the plaintiff had engaged in substantial gainful activity since the onset of the disability, the ALJ found that the plaintiff had "not engaged in substantial gainful activity since January 1, 2009, the

amended" onset date. Id. at 15. Specifically, the ALJ found that the average of twenty hours of work per week which the plaintiff reported working at Advocap, at a wage of $7.25, an hour did not constitute substantial gainful employment. Id.

Next, the ALJ found that the claimant suffered from two severe impairments: degenerative disc disease and osteoarthritis. Id. at 15-16. These impairments "resulted in more than a minimal limitation of functional capacity. Id. at 16. He concluded, however, that the impairments did not "meet[] or medically equal[] the severity of one of the [SSA's] listed impairments." Id. It is the ALJ's conclusion at this step of the process which the plaintiff challenges on appeal.

According to the ALJ, the plaintiff had "the RFC to perform sedentary work," with a few limitations. Id. at 16-20. The ALJ concluded that this capacity did not preclude the plaintiff from "performing past relevant work as a clerical assistant and accounting clerk." Id. at 20. As a result of the finding that the plaintiff could perform her past, relevant work, the ALJ determined that he did not need to analyze the ability of the claimant to perform work available within the national economy. Id.

In reaching this conclusion, the ALJ provided a detailed overview of the claimant's medical history. Dkt. No. 28-3 at 17-20. His analysis included a review of the plaintiff's annual physicals, unscheduled doctor visits, and the regular meetings with her psychiatrist. Id. The ALJ specifically noted that "[o]n December 8, 2011, the claimant was medically released to sedentary work by

14

her treating physician's assistant with limitations . . . due to chronic low back/buttock pain." Id. at 19.

On appeal, the plaintiff argues that in making the determination that the plaintiff's RFC did not preclude her from doing work such as clerical and accounting work, the ALJ failed to include all of the assessments made by the physician's assistant on December 8, 2011. Dkt. No. 21 at 15. She argues, for example, that the ALJ did not mention that the physician's assistant "opined Plaintiff was capable of sedentary work with the following restrictions of frequent sitting/driving; occasional to frequent standing/walking; never climb, bend, kneel/squat/crawl; could bilaterally frequently: horizontally reach/push/pull; reach above shoulders; perform gross handling; fine finger manipulation; single grasping and repetitive foot movement." Id. at 15-16. The plaintiff also argues that the ALJ did not reference the physician's assistant's conclusion that "because of Plaintiff's chronic low back and buttocks pain, Plaintiff needed to be exempted from bending/lifting duties which aggravated her condition," id. at 16, and that the plaintiff "was also not to engage in prolonged standing or walking," id. She argues that the ALJ did not discuss whether he'd considered how long the physician's assistant had been treating the plaintiff, or how well he knew her, and instead relied on "a State Agency reviewing physician who had never treated or even seen Plaintiff." Id. at 16-17. The plaintiff argues that "the primary issue is that the ALJ failed to comment on whether he accepted or rejected [the physician assistant's] medical opinion." Dkt. No. 30 at 1. The plaintiff contends that if the ALJ had gone into more

15

detail regarding the physician assistant's opinion, he "might well have reached a different conclusion." Id. at 2-3.

20 C.F.R. §404.1513(a) lists sources that "can provide evidence to establish an impairment." Those include: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§404.1513(a)(1)-(5). Subpart (d) states, "In addition to evidence from acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. §§404.1513(d). Those "other medical sources" may include, "for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists." 20 C.F.R. §§404.1513(d)(1).

The SSA has acknowledged the growth of the healthcare system, which has included the rise in use of nurse practitioners and physicians. See SSR 06-3p, available at http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html. While the SSA does not deem these persons "acceptable medical sources," for the purpose of determining disability benefits, the SSA does allow ALJs to consider the opinions of these professionals. Id. Because the law requires an ALJ to "consider all relevant evidence," the ALJ's decision should include "opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." Id. If done, the ALJ "should explain the weight given to

16

"such opinions" or otherwise include a discussion that allows a "reviewer to follow the adjudicator's reasoning, when such opinions may have" affected the ALJ's determination. Id.

The law does not require the ALJ to mention, summarize, or include all of the relevant evidence. See Golembiewski v. Barnhart, 322 F.3d 912, 915-17 (7th Cir. 2003). The court has found no case directing that a district court must remand an ALJ's decision for failure to mention, analyze, or include the assessments of a physicians' assistant. While the CFR allows an ALJ to use a physician's assistant as a medical source, the law does not require the ALJ to do so.

It is true that the ALJ did not specifically state what weight he gave the December 8, 2011 physician's assistant's conclusions, or mention every single finding in the PA's report, or discuss the PA's history with the plaintiff. But SSR 06-3p indicates that the ALJ must include such an extended discussion only when the PA's opinions may have affected the ALJ's reasoning. In the plaintiff's case, the ALJ relied on an extensive medical history spanning a period of over three years; the December 11, 2008 PA's report was one of many the ALJ reviewed. Further, the plaintiff does not make clear how the PA's opinions might have changed the ALJ's conclusion. The December 8, 2011 PA's report cleared the plaintiff for sedentary work and frequent sitting. While the PA concluded that the plaintiff could not bend or lift, and could engage in only occasional walking/standing duties, that finding is not inconsistent with the

ALJ's conclusion that the plaintiff's residual functional capacity did not prohibit her from performing clerical or accounting work.

The court finds that the ALJ's conclusion as to the plaintiff's physical RFC was supported by substantial evidence.

     2.     *The evidence regarding the RFC finding as to mental/emotional impairment*

The Social Security regulations require an ALJ to use a "special technique" to determine the level or existence of a claimant's mental impairment and "whether that impairment causes functional limitations". <u>Craft v. Astrue</u>, 539 F.3d 668, 674 (7th Cir. 2008) (citing 20 C.F.R. §404.1520a). "If a limitation is of listings-level severity, then the claimant is conclusively disabled. Thus, the special technique is used to evaluate mental impairments at steps two and three of the five-step evaluation." <u>Id.</u>

"The special technique requires that the ALJ evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment." <u>Id.</u> "If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration; persistence, or pace; and episodes of decompensation." <u>Id.</u>

The ALJ addressed this technique at step three in the RFC determination process. Dkt. No. 28-3 at 16. He stated, "In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has mild difficulties. With regard to concentration, persistence or pace, the claimant has

mild difficulties. As for episodes of decompensation, the claimant has experienced one or two episodes of decompensation, each of extended duration." <u>Id.</u> The ALJ noted that he "considered singly and in combination . . . the severity of the claimant's mental impairments." <u>Id.</u> The ALJ determined that "the claimant's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration," and that the claimant did not have "marked" restrictions, difficulties, or limitations. <u>Id.</u>

The ALJ indicated that while "the claimant has been diagnosed as having a generalized anxiety disorder and a depressive disorder (not otherwise specified)," the claimant "is without evidence of any marked of functional limitation." <u>Id.</u> He mentioned the plaintiff's psychiatric treatment, and noted that her doctor diagnosed her with "only mild functional limitations and as having an unlimited/very good or limited but satisfactory mental abilities and aptitudes needed to perform unskilled work, semiskilled and skilled work, and particular types of jobs." <u>Id.</u> As a result, the ALJ found only "mild" limitations on the plaintiff's daily life, social functioning, and concentration. <u>Id.</u>

On appeal, the plaintiff disputes this finding, focusing specifically on the hypothetical questions the ALJ posed to the vocational expert who testified at the hearing, and on the ALJ's alleged failure to consider all of the plaintiff's treating psychiatrist's opinions.

With regard to the ALJ's hypothetical questions to the VE, the plaintiff argues that "[t]he ALJ provided no limitations regarding [the] restrictions to the

VE, except to ask if in addition to the previous hypothetical the individual would require unscheduled breaks of undetermined duration and four or more absences in a work month. The VE responded then that would preclude all competitive employment." Dkt. No. 21 at 17-18. The plaintiff also asserts that the hypothetical questions failed to include any mental impairment limitations. Id. at 19. Specifically, she argues that "the ALJ never asked the VE if there would be jobs if the hypothetical individual missed work two days per month." Id.

"Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence. This does not mean that every limitation alleged by the claimant must be included—only those supported by the evidence." Wates v. Barnhart, 274 F. Supp. 2d 1024, 1040 (E.D. Wis. 2003) (internal citations omitted). A court may remand when the ALJ "elicit[s] incomplete testimony from the vocational expert." Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002). A court, however, "need not remand in search of the perfect hypothetical questions." Wates, 274 F. Supp. 2d at 1040. But, "when additional errors undermine the court's confidence in the ALJ's decision, remand is appropriate for this purpose as well." Id. at 1040-41 (citing Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002)).

At the hearing, the ALJ asked the VE:

> High school educated, no vocationally relevant subsequent training, that is exertionally limited to lifting or no more than 10 pounds. Unable to stand or walk more than two hours. Would require a sit stand option at will. Would be unable to balance, stoop, kneel, crouch or crawl more than occasionally. Uses

20

no ladders, ropes and scaffolds. And uses a cane to
ambulate. Unable to climb stairs, balance, stoop,
crouch or crawl more than occasionally. So we have
the postural, we're at a sedentary level. We've added
the cane recently. My question to you, would such a
hypothetical individual so limited be able to perform
any or all of Ms. Nitz' past work either as performed by
her or as commonly performed in the economy?

Dkt. No. 28-3 at 71-71. The VE responded that the claimant could perform the

work of "the clerical assistant and the accounting clerk." Id. at 72. The ALJ

then asked a second hypothetical: "If she – if in addition to everything in

hypothetical one there was a requirement for unscheduled breaks of

undetermined duration and four or more absences in a work month would that

preclude indeed all competitive employment?" Id. The VE concluded that "it

would." Id.

    The plaintiff's attorney then asked the VE, "If a person had a reduced

work pace, let's say of 20 percent on a consistent basis, would employers

tolerate that?" Id. The ALJ clarified the question, "A reduced work pace. Is that

vocationally relevant?" Id. at 72-73. The VE answered, "Generally at 20 percent

I believe you'd still be able to work. That's not the number where it comes into

question where it eliminates jobs." Id. The plaintiff's attorney followed up,

asking, "What is the number that comes into question?" Id. The VE answered,

"Twenty-five percent." The attorney responded, "So if a person was—and this is

consistent, on a consistent regular basis, you're saying that if a person is off—

has a reduced work pace of 20 percent an employer's going to tolerate that on a

regular basis?" Id. The VE answered, "That's what I'm saying." Id.

The plaintiff is correct that this exchange does not include any hypothetical questions from the ALJ regarding mental impairment limitations. But the ALJ's questions to the plaintiff addressed the issue. The following exchange occurred between the ALJ and the plaintiff at the January 9, 2013 hearing:

> ALJ: You've alleged some mental health issues. But I saw some other information that you didn't believe that the mental health was serious enough to affect your employment? What's your opinion on your mental health?
>
> PLAINTIFF: Well, I know that if I take my medication I feel so much better for taking it and . . .
>
> . . . .
>
> Q: Okay. Do you believe your mental health affects your ability to work?
>
> A: My mental health?
>
> Q: Your mental health, do you believe that affects your ability to perform work activity?
>
> A: Well, in some respects it might have if like everybody was trying to grab me at once and you know, at work. And I would be just like . . .
>
> Q: Yeah, but that's – wouldn't that be difficult for anybody that, you know so many people need your services and with cutbacks they all might need to do more with less and stuff like that? Isn't that difficult for everybody?
>
> A: I suppose it could . . .

Dkt. No. 28-3 at 56-57.

Further, as the defendant has argued, the plaintiff's attorney "had the opportunity to cross-examine the VE during the hearing and did not ask the

22

VE a hypothetical question regarding" additional limitations the plaintiff might experience. Dkt. 29 at 15-16. In <u>Donahue v. Barnhart</u>, 279 F.3d 441 (7th Cir. 2002), the Seventh Circuit chastised an attorney who failed to question the VE during a hearing about a discrepancy in data presented at the hearing. <u>Id</u>. at 446. The court concluded that the failure to question the VE's "foundation or reasoning . . . entitled [the ALJ] to accept the vocational expert's conclusions." <u>Id.</u> The Seventh Circuit noted that the SSA required that an ALJ explain a discrepancy in the VE's testimony only if the parties had identified that discrepancy at the hearing. <u>Id.</u> at 447. "Raising a discrepancy only after the hearing . . . is too late. An ALJ is not obliged to reopen the record." <u>Id.</u>

Related to her hypothetical questions argument is the plaintiff's argument that the ALJ failed to consider all of the opinions of her treating psychiatrist. With regard to the treating psychiatrist's opinions, the plaintiff argues that the ALJ failed to consider all of the following opinions of the plaintiff's treating psychiatrist: "plaintiff had decreased energy, generalized anxiety, somatization unexplained by organic disturbance, mood, disturbance, difficulty thinking or concentrating, recurrent, severe panic attacks manifested by a sudden, unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on average of once a month." Dkt. No. 21 at 18-19. She also argues that the ALJ did not consider the psychiatrist's opinion that when the plaintiff was anxious or depressed, she'd have more pain, or that the plaintiff would be absent about two days per month. <u>Id.</u> at 19.

The ALJ's opinion belies this argument. The opinion states:

> A Mental Impairment Questionnaire, dated December 28, 2010, and signed by the claimant's treating psychiatrist, disclosed that the claimant had been diagnosed as having a generalized anxiety disorder, a depressive disorder (not otherwise specified), and a personality disorder (not otherwise specified) evidence [sic] by decreased energy, generalized persistent anxiety, somatization unexplained by organic disturbance, mood disturbance, difficulty thinking or concentrating, and recurrent severe panic attacks that had resulted in a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration/persistence/page, and no episodes of the compensation [sic] (each of at least two weeks' duration during a 12-month period). Additionally, the claimant was assessed by the treating psychiatrist as having unlimited/or very good and limited/but satisfactory mental abilities and aptitudes needed to perform unskilled work, semiskilled and skilled work, and particular types of jobs. On the average it was anticipated by the treating psychiatrist that the claimant's impairments or treatment would cause her to be absent from work about two days per month.

Dkt. No. 28-3 at 18-19.

The ALJ, then, included an almost-verbatim recitation of the treating psychiatrist's findings in his opinion. He also factored the findings into his follow-up questions to the VE about whether someone with a 20% work pace reduction could perform clerical work. Again, while he did not specifically ask the VE a hypothetical question incorporating the psychiatrist's findings, the ALJ asked the plaintiff herself about the issue, and her answers support the ALJ's conclusion regarding her mental RFC.

The court finds, therefore, that the ALJ's finding that the plaintiff's mental RFC did not preclude her from doing clerical and account work was

24

supported by substantial evidence, and that his hypothetical questions to the VE do not require remand. The ALJ "provide[d] an accurate and logical bridge between the evidence and [his] conclusion" that the plaintiff is not disabled. Schreiber v. Colvin, 519 F. App'x 951, 957-58 (7th Cir. 2013). Further, there is no need ":to remand a case in quest for a perfect opinion unless there is reason to believe that the remand might lead to a different result." Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989).

> **B.**   **The ALJ's "boilerplate" credibility determination is not supported by specific findings in the opinion.**

The ALJ's decision contains the following statement: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." Dkt. No. 28-3 at 17. This is the only place in the ALJ's nine-page decision where he mentions credibility.

The above-quoted paragraph from the ALJ's decision in this case is the "oft-criticized boilerplate language" described as "meaningless" by the Seventh Circuit. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). The Seventh Circuit has "repeatedly criticized" the use of boilerplate language by ALJs when making a credibility determination. Schreiber v. Colvin, 519 F. App'x 951, 961 (7th Cir. 2013). The Seventh Circuit defines "boilerplate" in the context of ALJ decisions as "a single, conclusory statement that the individual's allegations

have been considered or that the allegations are not credible." Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The SSA has expressly prohibited boilerplate language in its 1996 Social Security Ruling (SSR) addressing the issue. See SSR 96-7p, available at http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html. "It is not sufficient for the adjudicator to make a single, conclusory statement" as to the claimant's credibility. Id. "The determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. Further, "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Id. An ALJ should consider daily activities, "location, duration, frequency, and intensity" of the alleged "pain and other symptoms," aggravating causes, dosages and effectiveness of the claimant's medications, any treatment the claimant has or will receive, and any other relevant factors. Id.

The court acknowledges that credibility determinations receive "special deference," because "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness . . . ." Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). In the Seventh Circuit, courts "will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." Id. Only when the ALJ's decision "lacks any explanation or support" will the reviewing court "declare it to be patently wrong and deserving of reversal."

Schreiber v. Colvin, 519 F. App'x 951, 960 (7th Cir. 2013). The court also acknowledges that "the use of [boilerplate] language is not fatal if the ALJ has otherwise explained his conclusion adequately." Schreiber, 519 F. App'x at 961 (quotation marks and citation omitted).

The ALJ's opinion is detailed, and consistently compared the plaintiff's symptoms, both physical and mental, against the reports and opinions of her treating doctor and psychiatrist. But the opinion does not link any of those detailed reviews or comparisons to *credibility*. Despite the fact that the 1996 SSR stated that an ALJ's analysis "requires the adjudicator to make a finding about the credibility of the individual's statements," SSR 96-7p, in this case, the ALJ did not state which parts of the plaintiff's testimony he found to be less than credible, or why. "[T]he cases make clear that the ALJ must *specify* the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

For these reasons, the court vacates the final administrative decision denying the plaintiff's disability claim, and remands the case for further proceedings regarding why the ALJ determined that the plaintiff's statements were not "entirely credible."

## V.    CONCLUSION

The court **ORDERS** that the final administrative decision denying the plaintiff's claim for disability benefits is **VACATED.** The court **REMANDS** this case for further proceedings consistent with this order.

Dated in Milwaukee, this 30th day of September, 2015.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge